Matter of Giuliani (2024 NY Slip Op 03561)

Matter of Giuliani

2024 NY Slip Op 03561

Decided on July 02, 2024

Appellate Division, First Department

Per Curiam 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: July 02, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick,P.J.,
Sallie Manzanet-Daniels
Troy K. Webber
Cynthia S. Kern
Jeffrey K. Oing, JJ.

Motion No. 2024-01332, 2024-02063 Case No. 2021-00506 

[*1]In the Matter of Rudolph W. Giuliani (Admitted as Rudolph William Giuliani), a Suspended Attorney: Attorney Grievance Committee for the First Judicial Department, Petitioner, Rudolph W. Giuliani, (OCA Atty. Registration No. 1080498), Respondent.

Disciplinary proceedings instituted by the Attorney Grievance Committee for the First Judicial Department. Respondent was admitted to the Bar of the State of New York at a Term of the Appellate Division of the Supreme Court for the Second Judicial Department on June 25, 1969.

Jorge Dopico, Chief Attorney, Attorney Grievance Committee, New York City (Kevin M. Doyle, Esq., of counsel), for petitioner.
Barry Kamins, Esq. and John Leventhal, Esq., Aidala, Bertuna & Kamins, P.C., for respondent.

Per Curiam. 

Respondent Rudolph W. Giuliani was admitted to the practice of law in the State of New York by the Second Judicial Department on June 25, 1969, under the name Rudolph William Giuliani. At all relevant times, respondent maintained a law office within the First Judicial Department.
The Nature of This Proceeding
The disciplinary charges stem from the allegations that respondent communicated demonstrably false and misleading statements to courts, lawmakers, and the public at large in his capacity as lawyer for former President Donald J. Trump and the Trump campaign in connection with Trump's failed effort at reelection in 2020. These false statements were made to improperly bolster respondent's narrative that due to widespread voter fraud, victory in the 2020 United States presidential election was stolen from his client.
Relevant Prior History
By order entered June 24, 2021, in accordance with the Rules for Attorney Disciplinary Matters (22 NYCRR) § 1240.9(a)(5), this Court immediately and until further order of the Court suspended respondent from the practice of law, based on uncontroverted evidence that he communicated demonstrably false and misleading statements to courts, lawmakers, and the public at large, which conduct immediately threatened the public interest (Matter of Giuliani, 197 AD3d 1 [1st Dept 2021]).
In February 2023, the Attorney Grievance Committee (AGC) served respondent with a petition of 20 charges based on the misconduct underlying his interim suspension. Respondent answered, and in reply the AGC requested that the charges be sustained and that the Court enter an order imposing discipline upon respondent, or in the alterative, that the matter be referred for a hearing on any issue the Court deemed appropriate.
In July 2023, in accordance with 22 NYCRR 1240.8(a)(2), the parties filed an amended joint stipulation of disputed and undisputed facts. By August 14, 2023 unpublished order (M-3476), the Court appointed a Referee to conduct a hearing on the charges and to file a report making findings of fact and conclusions of law, and recommending such discipline, if any, as may be appropriate.
Referee's Liability Hearing and Findings [FN1]
In October 2023, the Referee convened a six-day liability hearing at which the AGC called respondent as its only witness and introduced documentary evidence[*2]. Respondent called three witnesses and introduced documentary evidence. On or about October 30, 2023, the Referee informed the parties that she intended to make misconduct findings and that a sanction hearing would be held.
At the end of the liability hearing, the Referee found that the AGC had proven 16 charges. Regarding the proven charges, respondent essentially conceded most of the factual predicates supporting the alleged acts of misconduct as gathered from the stipulated facts, the documentary evidence and the testimony presented. Instead, respondent fundamentally presented the defense that he lacked knowledge that statements he had made were false and that he had a good faith basis to believe the allegations he made to support his claim that the 2020 Presidential election was stolen from his client. The Referee rejected the lack of knowledge-good faith defense, explicitly finding that, regarding the proven charges, he had made "knowing falsehoods" and that each falsehood was made "with the intent to deceive." Moreover, regarding four of the proven charges, the Referee found that because the knowing falsehoods were made under oath, respectively to certain state legislators, courts and the AGC, these acts of professional misconduct also constituted violations of the Penal Law provisions against perjury. The specific findings are summarized as follows:
People Brought from Camden, N.J. to Vote Illegally in Philadelphia
The Referee found that during a November 19, 2020, press conference at Republican National Headquarters, respondent, in violation of New York Rules of Professional Conduct (22 NYCRR 1200.0) rules 4.1, 8.4(c), and 8.4(h), falsely and dishonestly asserted to the public that people were brought from Camden, New Jersey to vote illegally in Philadelphia, Pennsylvania during the 2020 Presidential election.
In the parties' amended joint stipulation of disputed and undisputed facts, respondent admitted that "[t]here exists no evidence that persons from Camden, New Jersey, came to Philadelphia, Pennsylvania, to vote in the 2020 election." Before the Referee, respondent testified that he initially heard this story about Camden voters in 1977 and 1978 from an individual named Jay Waldman and that he then heard it repeated over the years. However, during his September 29, 2022 deposition before the AGC, respondent testified that he could not provide any evidence that people were bused from Camden to Philadelphia in 2020, nor did he remember anyone telling him that such busing occurred. In his answer to the charges, respondent slightly altered his story and stated that he could not recall who told him about the purported busing in the 2020 election. The Referee opined that "[t]his subtle alteration by Respondent in his explanation [was] illustrative of his attempts to deceive this Tribunal."
Still, respondent testified before the Referee that the purported busing was "common knowledge" and that he was more recently informed about [*3]it by one Michael Roman (who did not testify at the hearing) and that such voter fraud goes on in other U.S. cities, including New York. Respondent, however, was unable to cite any convictions, prosecutions, arrests, or investigations of such alleged activities following the 2020 election period. Notwithstanding the lack of specific evidence, respondent maintained that he was entitled to draw a reasonable inference that voters were bused from Camden to Philadelphia during the 2020 Presidential election and that he honestly believed that what he said was true. The Referee, however, found that the "argument that a good faith basis for the statements emanates from 'common knowledge' is an empty one" and "is nothing more than a collection of fables designed to deceive."
Thousands of Votes Cast in the Names of Dead People in Philadelphia
The Referee found that on November 25, 2020, in violation of rules 4.1, 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly claimed to Pennsylvania state legislators that in Philadelphia during the 2020 Presidential election, many thousands of votes were cast in the names of dead people.
Respondent stipulated that "[m]any thousands of votes were not cast in the names of dead people in Philadelphia during the 2020 election." Further, the Referee found that respondent knew, or should have known, that on November 11, 2020, Philadelphia Commissioner Al Schmidt, a Republican, made a televised statement in which he criticized the allegations of fraud as having no basis in fact and specifically concluded that the investigations regarding dead voters had led nowhere.
Respondent defended his statement by asserting that his team, led by one Phil Waldron and respondent's lead investigator Bernard Kerik, had given him lists of dead people who had voted in 2020 in Philadelphia. Thus, he argued that he was justified in relying on the information as he had great trust in the reliability of Waldron and Kerik. However, the Referee observed that Waldron, when deposed by the AG, had repeatedly invoked his Fifth Amendment privilege against self-incrimination and that Kerik was a twice-convicted felon who had been pardoned by former President Trump.
The lists themselves were derived from three charts that respondent provided. Respondent testified that he did not have time to carefully read the charts and that, in any event, he would not have understood them. Kerik, however, testified before the Referee that respondent had read the three charts and had not just seen or skimmed through them.
Further, as the AGC's analysis of the charts indicate, they related to the entire state of Pennsylvania and the information specific to Philadelphia had to be extrapolated from the charts. Based on its analysis, the AGC estimated that somewhere between 50 and 130, but closer to 50, "graveyard" votes are found using the charts. Respondent did not challenge the AGC's methodology or conclusion. However, he maintained that his statement [*4]was not intentionally or knowingly false; rather, his reliance on the information that he was given was justified, and, at most, he was "arguably negligent."
Respondent also defended his statement by claiming that the Thomas More Society had given him information that an estimated 30,ooo people had voted from their graves. Respondent was asked to provide documentation of this estimate by the Thomas More Society but did not do so. In the end, the Referee found "[t]he statement was made wildly, falsely and dishonestly without regard for its truth or accuracy."
Vote Cast in the Name of Deceased Boxing Champion Joe Frazier
The Referee found that, in violation of rules 4.1, 8.4(c), and 8.4(h), respondent falsely and dishonestly asserted to the public that a vote was cast in the name of deceased boxing champion Joe Frazier in Philadelphia during the 2020 election. Respondent made the statements at issue during a November 7, 2020 press conference at Four Seasons Total Landscaping and again during four radio broadcasts in March and August 2021.
Respondent stipulated that "[a] vote was not cast in the name of deceased heavyweight boxer Joe Frazier [] during the 2020 election in Philadelphia." Additionally, the Referee observed that respondent knew from documents submitted on the February 2021 motion to suspend him that Frazier's eligibility to vote had been canceled within months of his 2011 death. Nevertheless, respondent continued to maintain that votes were cast in Frazier's name. Respondent argued that in making the statements, he was never referring to Frazier having voted in 2020, but rather had relied on a blogger who purportedly wrote that Frazier voted in 2018; respondent stated that in fact, he never said that Frazier had voted in 2020. While respondent claimed to have been speaking about some year in the past, not 2020, the Referee noted that 2020 was the year in which the most recent election had taken place, and the year in which respondent first made the statement concerning Frazier. Thus, characterizing respondent's explanation as a "strained interpretation of his statements," the Referee found that "[t]he words Respondent used clearly convey a reference to the 2020 election and cannot be interpreted otherwise."
Extraordinary Number of Voter Fraud Convictions in Philadelphia
The Referee found that respondent falsely and dishonestly asserted that in Philadelphia there occurred "an extraordinary number of voter fraud convictions that stood as evidence of endemic election fraud in that city." Respondent made the alleged offending statement four times: first, during the November 7, 2020 press conference at Four Seasons Total Landscaping; second, during a November 17, 2020 appearance in the United States District Court for the Middle District of Pennsylvania, in violation of Pennsylvania Rules of Professional Conduct rules 3.3(a)(1), 4.1,and 8.4(c), which controlled under New York rule 8.5(b)(1); third, on November 25, 2020 before Pennsylvania [*5]state legislators; and fourth, on December 14, 2020 before Missouri state legislators, while testifying under oath, in violation of New York rules 4.1, 8.4(b), 8.4(c), 8.4(d), and 8.4(h).
The Referee cited an extensive, detailed study conducted by the AGC, as well as a search done by respondent, which showed that between 2013 and 2022 there were a total of 14 voter fraud convictions in Philadelphia. Respondent defended his characterization of widespread voter fraud in Philadelphia by comparing this number to the number of voter fraud convictions in New York City for the same period, asserting in his post-hearing memorandum that New York City had only one such conviction during the relevant period. The Referee, however, found that respondent's comparison was immaterial; while respondent produced a two-page exhibit listing various articles and a website which discussed the history of voter fraud in Philadelphia, he never produced any of the listed materials and the AGC showed the irrelevance of each item in its post-hearing memorandum. Further, nowhere did respondent assert that he had read or knew of the contents of any of the proffered materials before he made his statements about voter fraud in Philadelphia. Thus, the Referee found that respondent's statements were not mere exaggerations, but falsehoods designed to deceive his listeners.
Ballots Smuggled from Long Island, New York, Into Pennsylvania
The Referee found that, in violation of rules 4.1, 8.4(b), 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted that, during the 2020 election, ballots were smuggled by truck from Bethpage, New York into Pennsylvania. Respondent made the alleged offending statements, under oath, at a December 2, 2020 hearing before Michigan state legislators and at the December 14, 2020 hearing before Missouri state legislators.
As the AGC indicated, this story was first introduced by respondent's associate Phil Waldron at the December 2, 2020 Michigan hearing and respondent adopted it during his statements. (The AGC attempted to depose Waldron, but he refused to testify, repeatedly asserting the Fifth Amendment). Truck driver Jesse Morgan was identified as the source of the story. The record includes an unsworn, unnotarized November 26, 2020 "affidavit" from Morgan, who estimates that there could have been 250 to 7,500 ballots in the bins he was transporting in the truck. The record also includes a news article in which Morgan is described as a persistent liar with a history of drug and domestic abuse and a criminal record  namely, a forgery conviction and parole violations.
Kerik testified that he participated in a White House meeting at which a state senator purportedly said that he had a relative who had participated in transporting ballots from Bethpage to Pennsylvania, and that Morgan's claims had been validated in a report by the U.S. Postal Service. Included in the record is a February 8, 2022 closing memorandum by the USPS Inspector [*6]General's Office, which had conducted a joint investigation with the FBI. However, the Referee found that the report was not consistent with Kerik's testimony, nor did it corroborate Morgan's statements regarding ballots, but rather, "in some detail negat[ed] his claims regarding ballots." Moreover, respondent stipulated that "[a]n investigation by the FBI and DOJ concluded that claims about a truck bringing ballots from Bethpage, Long Island to Pennsylvania were unfounded." Nevertheless, before the Referee, respondent maintained that his statements had a good faith basis and were not made falsely or dishonestly, which the Referee found "def[ied] credulity."
Thousands of Non-US Citizens Voted in the 2020 Election in Arizona
The Referee found that, in violation of rules 4.1, 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted, that in Arizona, tens of thousands or even hundreds of thousands of non-US citizens voted in the 2020 Presidential election. Respondent made the alleged offending statements during a November 30, 2020 appearance before Arizona state legislators and to the general public in December 2020 and January 2021 during three radio broadcasts and two podcasts.
Respondent stipulated that "[n]o evidence supports the claim that tens of thousands or hundreds of thousands of non-US citizens voted in Arizona during the 2020 election." Nevertheless, before the Referee, respondent continued to defend his statements by relying on two undated documents entitled, "Evidence of Arizona Voting Irregularities" (which was not signed) and "Arizona Snapshot of Certain Reported Election Anomalies Prepared By: AZ GOP & Trump Legal Team." As to these documents, the Referee found that "each contains unsupported assertions about illegal persons being registered to vote or having voted. Neither can begin to form a good faith basis for Respondent's divergent claims."
Respondent testified that he also relied on information from Arizona State Representative Kelly Townsend regarding the U.S. Supreme Court case Arizona v Inter Tribal Council of Arizona, Inc. (570 US 1 [2013]), revolving around Arizona's unique voter registration requirements, including the necessity of providing documentary proof of citizenship. The Supreme Court held that Arizona's registration requirements were unlawful because they were preempted by federal voting laws. Townsend speculated that this decision would allow 36,000 people to vote in Arizona who could not prove that they were citizens. The Referee, however, found that the US Supreme Court decision did not support the allegations of voter fraud because "individuals who simply cannot produce documentation of citizenship are not necessarily non-citizens as recognized by the United States Supreme Court in the case cited []." Thus, the Referee found that "Respondent's claims of illegal voters participating in the election in Arizona are, on their face, false and dishonest."
Video Recording of State Farm [*7]Arena in Atlanta Proving Large-Scale Fraud
The Referee found that, in violation of rules 4.1, 8.4(b), 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted that a video recording from the State Farm Arena (SFA) in Atlanta, Georgia constituted proof of large-scale fraud during the 2020 election. Respondent made the alleged offending statements on multiple occasions: on December 3, 10, and 30, 2020 before Georgia state legislators; on December 14, 2020, while testifying under oath before Missouri state legislators; and to the public in December 2020 and January 2021 during five radio broadcasts and a podcast.
The Referee pointed out that respondent made these statements even though on December 4, 2020, Gabriel Sterling, the Voter System Implementation Manager for Georgia, had announced that the videos from SFA had been examined and only "normal ballot processing had occurred." Before the Referee, however, respondent repeatedly took issue with the SFA recordings, which were admitted into evidence on consent prior to the hearing. Respondent, nevertheless, vigorously asserted that the tapes had been altered by the Georgia Secretary of State or the AGC. While respondent asserted that he possessed "the tape" himself and was given permission to produce "the tape," he never did so. In any event, the Referee found that the AGC had refuted respondent's claim of alteration of the video recordings in its post-hearing memorandum. Thus, the Referee found not only that the "SFA tapes simply do not show any illegal activity" but that respondent's "invested . . . falsehood . . . extended even to casting two innocent election workers as 'serial criminals'."[FN2]
Dominion Voting Machine Manipulation During Georgia 2020 Election
The Referee found that, in violation of rules 4.1, 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted that Dominion voting machine manipulation yielded fraudulent results in Georgia during the 2020 election. Respondent made the statements at issue on December 10 and 30, 2020 before Georgia state legislators and to the public in December 2020 and January 2021 during two radio broadcasts and a podcast.
The Referee found it significant that all of respondent's statements were made after then-US Attorney General William Barr's December 1, 2020 pronouncement that there had been no widespread fraud in the election, and after the November 12, 2020 statement by Chris Krebs, the Director of the Cybersecurity, and Infrastructure Security Agency (a Trump appointee), that "[t]he November 3rd election was the most secure in American history. There [was] no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." Also, respondent stipulated that "[f]or the 2020 presidential election, the State of Georgia carried out both a recount by hand of all ballots cast and a recount by re-scanning of all ballots cast. These recounts confirmed that more Georgia voters voted for candidate [*8]Biden than for candidate Trump."
Still, before the Referee, respondent maintained that the votes recounted had been altered, which rendered the recounts meaningless. He relied on several sources for this claim, each of which the Referee discounted: Respondent relied on Phil Waldron, but Waldron did not appear at the hearing so he could be examined regarding his claims. Respondent relied on Misty Martin Hampton, who appeared at the hearing in a video and speculated how Georgia's vote "adjudication process" could be used to manipulate a Dominion machine to alter votes. However, the Referee found that the video was not relevant as the adjudication process that Hampton demonstrated could take place only in the presence of a bipartisan team. Respondent also relied on Katherine Friess, a member of the Trump legal team who wrote a booklet about the Dominion machines and attacked the integrity of the machines. However, the Referee noted that Friess never claimed that the machines could produce altered votes.
Respondent also relied on Garland Favorito, who made various claims regarding the SFA videos and the announcements that respondent said could be heard on them. The Referee discounted this evidence because the videos, which were played at the hearing, had no soundtrack so nothing could be heard. Respondent also cited the Dominion manual, which he claimed showed how to attach the machine to the internet and how to alter votes. Again, the Referee discounted his claim because only a portion of the manual was in the record, opining that the selected pages "do not explain how to make a Dominion machine falsify a paper ballot."[FN3]
Thousands of Votes Cast in Name of Dead People During Georgia 2020 Election
The Referee found that, in violation of rules 4.1, 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted that, during the 2020 election in Georgia, thousands of votes were cast in the names of dead people. Respondent made the alleged offending statements on December 30, 2020, before Georgia state legislators, and to the public in December 2020 and January 2021 during two podcasts and a radio broadcast.
Respondent stipulated that "[v]otes were not cast in the names of hundreds or thousands of dead people during the 2020 election in Georgia." Nevertheless, respondent maintained that when he made those statements, he believed them to be true. In support of his position, respondent relied in part on the affidavit of one Bryan Geels. The Referee discounted Geels' affidavit because he had no expertise in statistics or elections, and because Geels said that he relied on publicly available official records, not on death notices, and he used birth years only, not full birth dates. Also, Geels tentatively set the maximum number of deceased persons who voted at 10,315, which he indicated may have included false positives due to the way he calculated it.
In addition, respondent relied on a petition filed by attorney Ray S. Smith III in Matter [*9]of Trump v Barron. The Referee also discounted it because Smith used the Geels affidavit when drafting the petition and withdrew the petition in January 2021 before any factual findings. Also, the Smith petition was never admitted into evidence, and the Referee found that respondent could not enlarge the record in this manner. The Referee also noted that on December 23, 2020, before respondent made several of the charged statements, Ryan Germany, counsel to the Georgia Secretary of State, told Georgia state legislators that the claim of 10,000 posthumous votes was not true and that there were only a handful of such votes, which was not out of the ordinary. When questioned at the hearing about Germany's statements, respondent simply answered that he "thought [Germany] was specifically lying."
The Referee found not only that Respondent advanced inconsistent versions of his claim about votes cast in dead people's names to the public in various broadcasts but that his claims ran contrary to the investigative findings of the Georgia Secretary of State's Office.
Thousands of Felons Voted Illegally During the 2020 Election in Georgia
The Referee found that, in violation of rules 4.1, 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted that, during the 2020 election in Georgia, thousands of felons voted illegally. Respondent made the alleged offending statements during his December 30, 2020 appearance before Georgia state legislators and to the public during a January 5, 2021 podcast. Respondent stipulated that "[n]either hundreds nor thousands of ineligible felons voted during the 2020 election in Georgia."
While his statements were admittedly untrue, respondent maintained before the Referee that he believed them to be true and that he had a good faith basis for his belief. Again, respondent relied on the Geels affidavit and the Smith petition. As explained, the Referee found deficiencies with both. In addition, as to felons voting, the Geels affidavit gave 2,560 as a possible maximum number. However, as already noted, Geels qualified this, noting that his analysis may have contained false positives.
The Referee also found that respondent ignored counsel Ryan Germany's testimony that the 2,560 number of felons whom some people, including respondent, stated had voted illegally was not correct and that in fact, 74 was the true number of such ballots, and each of these persons were being investigated to determine if they were still under felony sentence when they voted. Respondent again accused Germany of lying. However, the Referee found that "Mr. Germany's testimony, especially when combined with the deficiencies in the Geels Affidavit and in the lack of validity of Mr. Smith's petition[,] would [] have put any reasonable attorney on notice that the over 2,000 numbers lacked a valid foundation."
Thousands of Votes Cast in Names of Underaged Individuals in Georgia 2020 Election
The Referee found that, in violation of rules [*10]4.1, 8.4(c), and 8.4(h), respondent falsely and dishonestly asserted that in Georgia during the 2020 election, tens of thousands of votes were cast in the names of, or by, underaged individuals. Respondent made the alleged offending statements during two radio broadcasts and a podcast in January 2021. Specifically, in January 2021, on his radio show and during a podcast, respondent claimed that between 65,000 to 66,248 underage voters had voted in Georgia; and in a January 2021 radio broadcast he claimed that 165,000 underage voters had voted in Atlanta. However, respondent stipulated that "[v]otes were not cast in the names of tens of thousands of underage individuals during the 2020 election in Georgia."
Respondent again maintained that he made the statements at issue honestly and with a good faith basis, while relying on the Geels affidavit and the Smith petition. The Geels affidavit described the purported number of underage voters as "66,247 individuals whom the State's data base identifies as having cast a ballot whose records indicate that they were registered to vote prior to their 17th birthday." However, the Referee noted that "Geels does not single out the city of Atlanta and he focuses on the age at registration, not the age at voting. Mr. Germany also commented on this point in his December 23, 2020, testimony and he testified that an investigation had revealed zero votes by the underaged." Thus, the Referee found, respondent's allegation "ran contrary to the investigative findings of the Georgia Secretary of State's Office."
Trucks Delivered Ballots in Garbage Receptacles and Paper Bags to Michigan
The Referee found that, in violation of rules 4.1, 8.4(b), 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted that in Michigan, trucks delivered ballots in garbage receptacles and paper bags. Respondent made the alleged offending statements during the November 19, 2020, press conference at the Republican National Committee Headquarters, during his November 25, 2020 appearance before Pennsylvania state legislators, during his December 3 and December 10, 2020 appearances before Georgia state legislators, and in his April 14, 2021 affidavit filed with this Court in opposition to the AGC's interim suspension motion.
Before the Referee, respondent was unable to verify his claims of garbage can delivery. However, in his post-hearing memorandum, respondent asserted that he had relied on, among other things, his memory of what people purportedly told him — namely, the affidavits of Andrew Sitto and Eric Duss, and the testimony of one Melissa Crane at the hearing before Michigan state legislators. He also claimed to have relied on a video from rumble.com and Gateway Pundit. However, the Referee observed that respondent had previously stipulated that "[n]o affidavit attested to Michigan ballots' delivery in trash receptacles. No testimony before state legislators included the allegation that ballots in Michigan were delivered [*11]in trash receptacles." As to the video, the Referee opined that it "[was] similarly of no assistance to [r]espondent," as it "[did] not include the time or place of its making, nor [did] it substantiate Respondent's 'garbage can' claims."
Ultimately, respondent shifted his defense, maintaining that he was "confused," that many versions from various sources were in his head, and that the language he used was "inartful." The Referee, however, found that "[a] more accurate description of Respondent's [false] statements is fanciful at best."
Recordings of 1000 People Admitting to Committing Fraud in the 2020 Election
The Referee found that, in violation of rules 4.1, 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted that he had recordings of 1000 people admitting to committing fraud in the 2020 election. Respondent made the alleged offending statements during his December 10, 2020 appearance before Georgia state legislators. Respondent stipulated that he "does not have and has not previously had a tape on which one thousand people admitted to fraud during the 2020 election."
Before the Referee, respondent stated that he "misspoke" during his statements to the Georgia legislature and claimed that he meant to say that he had "records" of people "concerning" or "alleging" fraud and that he had not meant to say, "tape recordings." The Referee asked him what he meant by a "record," to which respondent answered, "[a]ffidavit, testimony, maybe even FBI interview." The Referee found the "mistaken statement" as "one intentional false claim built upon another."
2000 Court Affidavits Attesting to Firsthand Knowledge of Fraud
The Referee found that, in violation of rules 4.1, 8.4(b), 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted that 2,000 affidavits attesting to firsthand knowledge of fraud had been filed in court cases brought in support of former President Trump's reelection. Respondent made the alleged offending statements while testifying under oath before Missouri state legislators on December 14, 2020.
During his March 22, 2022, deposition before the AGC, respondent testified that his statements were true. However, the AGC conducted an extensive search and determined that the number of affidavits that had been filed in court cases in support of then-President Trump's reelection came to 564, with 314 having been filed more than once, which brought the total number of affidavit filings to 878. Respondent did not dispute the AGC's search methods or the results of the search. Nevertheless, respondent maintained that "when he made his claim as to two thousand affidavits attesting to firsthand knowledge of fraud and filed in court, he did so honestly and with a good faith basis and meant to refer to both affidavits actually filed and affidavits which were available for filing if a court hearing were granted and evidence presented."
The Referee found that "[r]espondent's assertion that he misspoke, yet [*12]again, in the manner he claims, is difficult to square with what he swore to on two occasions." The Referee also found that his defense was also not credible because respondent not only quadrupled the number of affidavits actually filed, but he also misrepresented the content of the affidavits themselves.
Characterization of Georgia's Secretary Of State Description of Election As "Perfect"
The Referee found that, in violation of rules 8.4(b), 8.4(c), 8.4(d), and 8.4(h), respondent falsely and dishonestly asserted under oath at his March 22 and September 29, 2022 depositions before the AGC that Georgia Secretary of State Brad Raffensperger had described the 2020 election in Georgia as "perfect." The Referee found that "[r]espondent [had] falsely and dishonestly claimed that Raffensperger had described Georgia's 2020 election as 'perfect'" to discredit Raffensperger, who contradicted respondent's allegations of widespread fraud in Georgia's 2020 election.
Initially, respondent claimed that Raffensperger called the election "perfect" in his January 2, 2021 phone conversation with President Trump. Respondent, however, stipulated that "[d]uring the [January 2, 2021] call between President Trump and Georgia Secretary of State Raffensperger, Secretary Raffensperger never referred to the 2020 election in Georgia as having been 'perfect.'" Before the Referee, respondent also admitted for the first time that he had not heard the purported boast by Raffensperger himself, but rather had been told about the use of the word "perfect" by others, including then-President Trump.
During the hearing, respondent claimed that the postelection stress he was under may have affected his memory and caused him to misspeak. Then, in his post-hearing memorandum, respondent argued that his statement was not false because Raffensperger had characterized the election as safe, secure, and honest without any illegality or irregularity, which in respondent's mind were "summarized" by the word "perfect." The Referee, however, noted that respondent had testified earlier that he was not paraphrasing when he used the word "perfect" and thus his "two explanations cannot stand together."
Finally, the Referee noted that respondent submitted no evidence to support his claim that Raffensperger had called the election "perfect" when speaking to the media. On the contrary, the evidence shows:
"[W]hen speaking to the media before the 2020 election, Raffensperger had explicitly declared that no election was 'perfect'. After the 2020 election, both in a letter to members of Georgia's congressional delegation and again when speaking to the January 6 Committee, Raffensperger reiterated that a 'perfect' election does not exist. Secretary Raffensperger did not lie by falsely claiming that Georgia had enjoyed the first perfect election in history. [Thus] Respondent lied about what Secretary Raffensperger actually said."
Characterization of Report By Georgia Secretary of State of Georgia [*13]2020 Election
The Referee found that, in violation of rules 8.4(b), 8.4(c), 8.4(d), and 8.4(h), respondent alleged that, in the course of the AGC's investigation  namely, during respondent's March 22, 2022 deposition before the AGC, respondent falsely and dishonestly asserted that a report provided to Georgia Secretary of State Raffensperger had both found the 2020 election in Georgia "very disturbing" and supported respondent's assertion that the video recordings made at the SFA were proof of fraud.
However, respondent stipulated that a report by consultant "Seven Hills Strategies . . . neither endorsed Respondent's claims about the video recordings made at SFA nor even mentioned those videos." Before the Referee and in his post-hearing memorandum, respondent again admitted that the SFA video recordings were not mentioned in the report and claimed that he "misspoke" about it, but respondent nevertheless argued that a fair reading of the report supported his characterization of the election as "very very disturbing."
The Referee found that the report by itself, as documentary evidence, supported the charge:
"Report does not contain the statements as quoted [] by Respondent and it undermines many of Respondent's other claims regarding activities at the SFA. The Report does not conclude, or give reason to conclude, that the election was 'very very disturbing'. It does identify some significant problems, but it does not support Respondent's claims."
The Referee also rejected respondent's "misspoken" defense. Instead, the Referee found:
"This has become a transparent pattern on the part of Respondent to avoid accountability for his material, intentional falsehoods. When something he has said has been shown to be false, Respondent asserts that it was a thoughtless, mere slip of the tongue no matter how mendacious it is. Respondent cannot avoid his responsibilities and the consequences of his behavior by simply saying he misspoke."
Referee's Sanction Hearing and Disbarment Recommendation
The sanction hearing convened on November 6, 2023. Respondent chose not to appear, but his counsel presented a mitigation witness and introduced two character letters. Respondent's counsel called attorney Robert Costello as a character witness. Costello, who has known respondent since 1971 and has been his personal attorney since 2016, testified to respondent's favorable reputation for honesty and truthfulness and expressed his view that respondent "will not say anything false that he knows is false." Costello acknowledged that his law firm is suing respondent for unpaid legal fees; nevertheless, he agreed to testify in support of respondent because, in his view, "it's the right thing to do." Respondent also submitted character letters from retired Judge Richard Weinberg and John Catsimatidis, Chairman and CEO of the Red Apple Group (the media company which hosts respondent's podcast), in which they laud respondent for his distinguished public service and [*14]accomplishments.
Following the sanction hearing, both parties submitted post-hearing memoranda. The AGC argued that all the charges should be sustained and, in conjunction with the aggravating factors, respondent should be disbarred. Respondent argued that the AGC had not proven any of the charges by a preponderance of the evidence — namely, that he knowingly made false or dishonest statements. As to any charge or charges sustained by the Referee, respondent argued that based on purported limited aggravation, his mitigation, and the fact that he had been under interim suspension for 2½ years, suspension, as opposed to the disbarment sought by the AGC, was the appropriate discipline.
On the issue of discipline, in accordance with 22 NYCRR 1240.8(b)(2), the Referee applied the ABA Standards for Imposing Lawyer Sanctions and found both aggravation and mitigation. As to the aggravation, the Referee found a pattern of misconduct. This pattern comprised 16 sustained charges involving 8 different disciplinary rules (which included 3 Pennsylvania rules applicable under New York rule 8.5[b][1]), falsehood during the disciplinary process — namely, false deposition testimony to the AGC and a lack of candor in his hearing testimony as to how liability was established against him in the defamation suit brought by the two Georgia election workers; substantial experience in the practice of law; illegal conduct — namely, "numerous lies under oath" before Missouri state legislators, in his affidavit in opposition to his interim suspension, and during his deposition before the AGC; and no acknowledgement of wrongdoing or acceptance of responsibility for his misconduct (see ABA Standards 9.22[c], 9.22[d], 9.22[f], 9.22[g], 9.22[i], and 9.22[k]). As part of the aggravation, the Referee cited respondent's "intemperate and defiant" behavior during the hearing:
"On the second day of the Hearing, October 11, 2023, Respondent accused counsel for the AGC of 'possibly deliberately' altering evidence. He then proceeded to engage in a back and forth with this Tribunal in which he was both sarcastic and disrespectful requiring his counsel to caution him . . . . Later that day, Respondent accused this Tribunal of 'railroading' him. He also made that same accusation again later in the proceedings. . . . On two occasions, the Hearing had to be paused and the Respondent excused from the room with one of his attorneys because of his disruptive and disrespectful behavior.
"On October 24, 2023, Respondent verbally attacked counsel for the AGC and asserted that he was being unfairly treated and that the proceedings were 'Completely political'. . . . Respondent engaged in similar behavior numerous times throughout the hearing. On October 26th, Respondent walked out of the hearing twice. On the second occasion, this Tribunal noted that Respondent was yelling and making allegations about having members of the AGC jailed. . . . . On the last day of the Hearing, which was devoted to [*15]the issue of sanction, Respondent chose not to appear."
The Referee also found mitigation — namely, no prior discipline, and character and reputation evidence, which attested to respondent's significant accomplishments as a public servant (see ABA Standards 9.32[a] and 9.32[g]).
The Referee ultimately concluded that the record in toto warranted respondent's disbarment:
"The undersigned has considered all the [relevant] ABA factors [], the aggravating and mitigating ones, Respondent's [c]haracter evidence and all the charges involved. Also, the goals of the attorney discipline process remain foremost. The purpose of this process is first to protect the public. It is also to serve as a deterrent to other lawyers from engaging in similar behavior and, importantly, to maintain the honor and integrity of the profession. See In Matter of Gould, 4 AD2d 174, 175 (1st Dept 1957).
"In this matter, the Respondent has an extraordinary record of service to the people of the State of New York and to our country. This includes service as the United States Attorney for the Southern District of New York, Associate Attorney General of the United States (the third ranking position in the Justice Department) and a two[-]term Mayor of the City of New York. He prosecuted hundreds of violent criminals and terrorists and has been credited by some for reducing the crime rate in New York City. Respondent has also been held in high esteem by many and recognized worldwide for his accomplishments and for his charitable work. For many, he even still occupies a special place in American folklore.
"Respondent's singular reputation and position as the personal attorney for the then President of the United States gave his acts and words a special currency to the public. They allowed what he said to be credited and his ideas to be believed when, if promulgated by others, they would be dismissed as incredulous. Taking advantage of his unique position, Respondent told numerous lies in numerous forums all designed to create distrust of the elective system of our country in the minds of its citizens and to destroy their confidence in the legitimacy of our government. This behavior has done immeasurable damage to our democracy.
"Respondent displayed no remorse for his actions and, indeed, during the Hearing, magnified his lack of contrition. After considering the record, it is the undersigned's recommendation that Respondent be disbarred. This recommendation is not made lightly, nor with the aim of punishing the Respondent. Rather, it is made with the stated purposes of attorney discipline in mind to protect the public, to educate the bar and to begin to heal the profession, in some measure, from the damage done by Respondent."
AGC's Motion to Confirm and Respondent's Cross-Motion to Disaffirm
By motion to confirm dated March 14, 2024, under Rules of the Appellate Division, First Department (22 NYCRR) § 6o3.8-a(t)(4) and 1240.8(b)(2), the AGC requests that the Court issue an [*16]order confirming the Referee's report in full and disbarring respondent. By cross-motion to disaffirm dated April 19, 2024, respondent opposes and requests that the Court issue an order disaffirming the Referee's report insofar as it sustained 16 charges and recommended his disbarment. Respondent also requests that should the Court agree with any of the Referee's misconduct findings, a lesser sanction than disbarment be imposed.
The AGC argues that the Referee's misconduct findings and disbarment recommendation are well supported by the record and should be confirmed in full. Regarding the disbarment sanction, the AGC argues that "only through dispassionate analysis, [an] analysis void of punitive aim and generous in characterization of mitigation, did the Referee reach that sanction recommendation which Respondent's defiant lack of contrition most especially renders inevitable: disbarment."
In opposition and in his cross-motion, respondent raises an overarching argument that the AGC's investigation into his conduct violates his First Amendment right of free speech. He does not attack the constitutionality of the particular disciplinary rules; he seemingly claims that they are unconstitutional as applied to him. Respondent also raises the argument that he was denied due process when the Referee denied his request to delay the hearing to permit him to call numerous witness who were under indictment or investigation.
On the merits of the allegations, respondent continues to argue he had a good faith basis to make most of the allegations regarding the 2020 Presidential election and that the AGC failed to prove by a preponderance of the evidence that even if his statements were false or misleading, he did not make the statements knowing they were false when he made them.
Finally, respondent requests that should this Court agree with any of the Referee's misconduct findings, disbarment should not be imposed. Respondent does not advocate for a specific sanction. Instead, respondent asks this Court to consider the mitigation cited by the Referee — namely, no prior discipline, a distinguished record of public service, and his character evidence as to his reputation for honesty and integrity (as testified to by Costello). Also, respondent maintains that "even if the Court adopts the Referee's conclusion that the [AGC] established the falsity of [his] statements, [he] ask[s] the Court to consider, as mitigation, the context in which the various statements were made." As to this context, respondent reiterates his position that his statements were not attributable to deliberate dishonesty but to negligence.
As a threshold consideration, we examine respondent's procedural grounds for rejecting the imposition of a sanction in this case. As to respondent's asserted First Amendment defense with respect to the intentional false statements he made to the public at large, this Court has previously considered and rejected them (Matter of Giuliani, 197 AD3d [*17]at 7).
We also find devoid of merit respondent's argument that in denying him a stay of the hearing the Referee and the Court deprived him of the ability to secure needed witness testimony, and thereby denied him due process. In his prior unsuccessful stay application to this Court, respondent's counsel stated that the would-be witnesses, through their respective counsels, had purportedly indicated that they would be unavailable to testify in respondent's defense due to their own legal issues. However, no evidence was presented that respondent actually attempted to compel the desired witnesses to testify — for example, by issuing subpoenas (see 22 NYCRR 1240.8[a][4]). Moreover, respondent did in fact present witness testimony — namely, that of Kerik, Bobb, and Engelbrecht, as well as other evidence in his defense.
We also find devoid of merit respondent's argument that the Referee engaged in burden shifting with respect to charge 4, and thereby denied him due process. That the Referee was not persuaded by respondent's evidence in defense against the charge that he vastly and falsely overstated the number of voter fraud convictions in Philadelphia, by no means suggests improper burden shifting. As set forth in the Referee's report, the Referee carefully considered the evidence presented by both parties with respect to this charge and found that there were approximately 14 voter fraud convictions in Philadelphia during the relevant 10-year period — not an "extraordinary number" of such convictions as respondent had falsely claimed. Rather than shift the burden to respondent, as he contends, the Referee found that the AGC had met its burden of proof with respect to charge 4, and the other 15 sustained charges as well. There is no credible basis to disturb any of the Referee's liability findings.
On the merits, we find that the Referee's liability findings sustaining the charges are fully supported by the record. The Referee's misconduct findings sustaining 16 charges are well founded and thoroughly explained, as is the Referee's rejection of respondent's proffered defenses. Respondent raises lack or absence of knowledge as a general defense, stating that even if his statements were false or misleading, he did not make the statements knowing they were false when he made them and that he had a good faith basis to believe them to be true. We agree that the Rules of Professional Conduct only proscribe false and misleading statements that are knowingly made. Both rules 3.3 and 4.1 expressly provide for an element of knowledge. While Rule 8.4 (c) contains no such express element, when we granted an interim suspension in this case, we previously held that knowledge is a required element of misconduct in violation of Rules of Professional Conduct, section 8.4 (c) (Matter of Giuliani, 197 AD3d 1 [1st Dept 2021], supra).
Contrary to respondent's allegations, there is nothing on the record before us that would permit the conclusion that respondent lacked [*18]knowledge of the falsehood of the numerous statements that he made, and that he had a good faith basis to believe them to be true. On the contrary, as the Referee properly found, the 16 acts of falsehoods carried out by respondent were deliberate and constituted a transparent pattern of conduct intended and designed to deceive. More specifically, as the Referee aptly described, respondent "told numerous lies in the numerous forums all designed to create distrust of the elective system of our country in the minds of the citizens and to destroy their confidence in the legitimacy of our government." Undeterred, respondent went as far as to attempt to deceive this tribunal by his numerous inconsistent statements before the Referee and the AGC.
As to the sanction, the Referee's disbarment recommendation is amply supported by the record and should be confirmed. The seriousness of respondent's misconduct cannot be overstated. Respondent flagrantly misused his prominent position as the personal attorney for former President Trump and his campaign, through which respondent repeatedly and intentionally made false statements, some of which were perjurious, to the federal court, state lawmakers, the public, the AGC, and this Court concerning the 2020 Presidential election, in which he baselessly attacked and undermined the integrity of this country's electoral process. In so doing, respondent not only deliberately violated some of the most fundamental tenets of the legal profession, but he also actively contributed to the national strife that has followed the 2020 Presidential election, for which he is entirely unrepentant. The aggravation cited by the Referee, which includes respondent's disruptive and disrespectful behavior during the hearing, significantly outweighs the mitigation and only adds to the case for his disbarment.
While no prior disciplinary cases involving intentionally made false statements are remotely comparable to this case, the case is still consistent with prior precedent of disbarment in cases where the attorneys engaged in a pattern of misconduct that included intentional misrepresentation and dishonesty (Matter of Zappin, 160 AD3d 1 [1st Dept 2018], appeal dismissed 32 NY3d 946 [2018], lv denied 32 NY3d 915 [2019] [disbarred for pattern of misconduct as pro se litigant in own divorce and custody litigation which included false testimony at custody trial and false accusations against, among others, wife, judge, and the attorney for the child]; Matter of Zweig, 117 AD3d 96 [1st Dept 2014] [disbarred for pattern of misconduct that included intentionally misrepresenting the true nature of litigation claims and false testimony in two separate disciplinary proceedings]; Matter of Alejandro, 65 AD3d 63 [1st Dept 2009], appeal dismissed 13 NY3d 788 [2009], lv denied 13 NY3d 714 [2009] [disbarred for pattern of misconduct that included misrepresentations to clients and superiors, false deposition testimony to AGC, and false statements during [*19]disciplinary proceeding]; Matter of Fagan, 58 AD3d 260 [1st Dept 2008], lv dismissed 12 NY3d 813 [2009] [disbarred for deliberate misrepresentations to the court, significant aggravation included lack of contrition and disruptive and dilatory conduct during disciplinary proceeding]; Matter of Friedman, 196 AD2d 280 [1st Dept 1994], appeal dismissed 83 NY2d 888 [1994], cert denied 513 US 820 [1994] [disbarred for pattern of misconduct that included submission of false affidavit and false testimony to court concerning same]).
Accordingly, AGC's motion to confirm the Referee's report and recommendation should be granted and respondent disbarred from the practice of law, effective immediately, and until the further order of this Court, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York. Respondent's cross-motion to disaffirm the Referee's report and recommendation should be denied.
All concur.
Wherefore, it is Ordered that the motion by the Attorney Grievance Committee for the First Judicial Department to confirm the Referee's report and recommendation pursuant to 603.8-a(t)(4) and 22 NYCRR 1240.8(b)(2) is granted, and respondent Rudolph W. Giuliani, admitted as Rudolph William Giuliani, is disbarred from the practice of law, effective immediately, and until the further order of this Court, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York; and
It is further Ordered that the cross-motion of respondent, Rudolph W. Giuliani, admitted as Rudolph William Giuliani, to disaffirm the Referee's report and recommendation, is denied; and
It is further Ordered that, effective immediately, pursuant to Judiciary Law § 90, the respondent, Rudolph W. Giuliani, admitted as Rudolph William Giuliani, is commanded to desist and refrain from (1) practicing law in any form, either as principal or agent, clerk or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and
It is further Ordered that respondent, Rudolph W. Giuliani, admitted as Rudolph William Giuliani, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see NYCRR 1240.15), which are made part hereof; and
It is further Ordered that if respondent, Rudolph W. Giuliani, admitted as Rudolph William Giuliani, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith.
Entered: July 2, 2024

Footnotes

Footnote 1: Only the charges sustained by the Referee are discussed here, as the AGC is not challenging the Referee's findings as to the four charges that were not sustained.

Footnote 2: The Referee took judicial notice that the two election workers obtained a judgment against respondent for defamation. Further, the Referee found that "during the hearing, respondent was not forthright about how liability was established against him in the defamation case brought against him by the two workers at the SFA."

Footnote 3: The Referee also found that Favorito had mischaracterized the affidavits of the GOP observers at the SFA.